IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 6, 2003 Session

## IN THE MATTER OF: C.A.F.

**Appeal from the Juvenile Court for Putnam County**
**No. 603 DCS     Nolan R. Goolsby, Judge**

---

**No. M2002-00516-COA-R3-JV - Filed February 20, 2003**

---

The trial court terminated the parental rights of the mother and the biological father of a three-year-old girl. It ruled, however, that there were no legal grounds to terminate the parental rights of another man who had signed a voluntary acknowledgment of paternity, but who admitted that he was not the actual father. We affirm the trial court's actions as to the child's biological mother and father, but reverse as to the other respondent.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part; Reversed in Part; and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J. and STELLA L. HARGROVE, SP. J., joined.

Paul G. Summers, Attorney General & Reporter; Dianne Stamey Dycus, Deputy Attorney General, for the appellant, Tennessee Department of Children's Services.

R. Steven Randolph, Cookeville, Tennessee, for the appellee, Ms. Smith.

E.J. Mackie, Cookeville, Tennessee, for the appellee, Mr. F.

### OPINION

#### I. AN ACKNOWLEDGMENT OF PATERNITY

On September 23, 1998, Ms. Smith[1] was found guilty of aggravated child abuse of her seven-year-old son, and was sentenced to twelve years imprisonment at the Tennessee Prison for Women. Her parental rights to the abused child and his younger sibling were subsequently terminated, and the children went into foster care. Before her conviction and sentencing, Ms. Smith had been

---

[1] Because of several marriages, Ms. Smith is referred to by three different names in the record of this case. For the sake of convenience (and relative anonymity) we will only use the surname of Smith when referring to her.

incarcerated in the Putnam County Jail, where she allegedly met K.F., who was being held for a DUI. Mr. F. visited Ms. Smith after she was sent to prison, and corresponded with her on a regular basis.

On June 5, 1999, Ms. Smith gave birth to the infant later known as C.A.F., a full-term baby girl. At the request of the mother, who wished to prevent the Department of Children's Services (DCS) from becoming involved in the child's life, Mr. F. agreed to be listed on the birth certificate as the father. On June 8, Mr.F. and Ms. Smith both signed a voluntary acknowledgment of paternity, and the infant was released to Mr.F.

Mr. F. lived in his parents' home in Clarksville. He and his mother took care of the baby for the first months of her life and became very attached to her. Although he was apparently aware that he was not C.A.F's biological father, he considered himself to be her "real" father, and his parents thought of themselves as C.A.F.'s grandparents. It seems likely that if he had not left Clarksville, Mr. F. would have been able to continue to raise C.A.F. as his own daughter without interference of any kind.

## II. A STRUGGLE FOR CUSTODY

However, in October of 1999, Mr. F. moved to Oklahoma with C.A.F. to live with B.H., a woman he had met in a chat room on the internet. Mr. F. and Ms. H. jointly took care of the child. After a few months, Mr. F. realized the relationship was not working out, and he decided to return to Tennessee. Ms. H. would not let him take C.A.F. Unbeknownst to Mr. F., she had been corresponding with Ms. Smith, and had obtained a power of attorney from the mother, which she claimed gave her custody rights.

Mr. F. returned to Tennessee, and after consulting with his parents and with an attorney, he then returned to Oklahoma with C.A.F.'s birth certificate to fight for custody. Ms. H. refused to return the child to Mr. F., and he contacted the police. Ms. H. also contacted the police, claiming that Mr. F. was an unfit parent. The Oklahoma Department of Human Services then became involved, took custody of C.A.F. and placed her in foster care.

Mr. F. hired an Oklahoma attorney, and filed a Writ of Habeas Corpus for custody of the child. Ms. H. filed a Petition for Guardianship. After a hearing on May 23, 2000, the District Court for Cherokee County, Oklahoma dismissed both the Writ and the Petition, found the child to be deprived, and ordered that she remain in foster care. Mr. F. subsequently married Ms. Smith. At trial he testified that he didn't love Ms. Smith, and that he had no intention of living with her when she was released from prison, but that he married her to improve his chance of regaining custody of C.A.F.

The Oklahoma Department of Human Services subsequently requested that the case be transferred to Tennessee, which was deemed to be C.A.F.'s home state. The district court agreed. The Juvenile Court of Putnam County accepted jurisdiction and the case was transferred on June 12,

2001. C.A.F. was returned to Tennessee and was placed in a foster family with her half-brother and half-sister.

### III. TERMINATION PROCEEDINGS

On July 19, 2001, the Department of Children's Services filed a Petition for Termination of Parental Rights. The petition named Ms. Smith, Mr. F., and H.J. as respondents. Ms. Smith had stated on several occasions that Mr. J. was probably C.A.F.'s biological father. DCS made a diligent effort to locate Mr. J., but was unable to find him, and had to serve him by publication only. The petition alleged that both Mr. J. and Mr. F. had abandoned C.A.F. within the meaning of Tenn. Code Ann. § 36-1-102.

The Juvenile Court conducted a hearing on the petition on November 19, 2001. Mr. F. and Ms. Smith both testified, as did Mr. F.'s parents, an employee of the Putnam County Sheriff's Department, and two DCS employees. The deposition testimony of two employees of the Oklahoma Department of Human Services was also introduced into evidence. Ms. Smith testified that she did not know who C.A.F.'s father was, but that Mr. F. was a possible candidate because they had a sexual encounter in a hallway in the Putnam County Jail. The Sheriff's Department employee testified that there was no possibility of that happening.

Mr. F. testified that he was the only person interested in taking C.A.F. home from the hospital, that he had always acted as a loving father to the child, that he believed himself to legally be her father, and that his emotional bond with her persisted despite their separation. He also testified that he married Ms. Smith solely for the purpose of getting C.A.F. back, and that after he had been separated from the child in Oklahoma due to the machinations of B.H., he had spared no expense or effort to visit her and/or to have her returned to him, but that he had been thwarted at every step of the way by the actions of the Oklahoma DHS and Tennessee DCS. At the conclusion of the proof, the trial judge took the case under advisement.

The trial court entered its Final Memorandum and Order on February 11, 2002. The court noted that shortly after the conclusion of the hearing, the results of DNA tests that had earlier been administered to Mr. F. were returned, which conclusively proved that Mr. F. could not be the biological father of C.A.F. The court also found that "there are so many contradictions and inconsistencies in the testimony of [Ms. Smith] that she has no credibility."

Although the trial judge acknowledged the probative value of the DNA test, he noted the strong emotional attachment that Mr. F. and his parents had formed for the child. The judge declared that, "[b]iology alone does not necessarily make a loving and caring parent-child relationship," and that he had seen "numerous cases where an adoptive parent or step-parent can have a much greater and more meaningful relationship with a child than the child has with his or her biological mother or father."

Despite the results of the DNA tests, the court ruled that Mr. F.'s parental rights could not be terminated. The court reasoned that under Tenn. Code Ann. § 24-7-113, a voluntary acknowledgment of paternity creates a conclusive presumption of that father's paternity, which can only be rescinded under very limited circumstances. The court held that those circumstances do not give the State standing to challenge the validity of the acknowledgment.

The court further found that even if the State had standing, it failed to carry its necessary burden of proving fraud, duress or material mistake of fact in the execution of the acknowledgment. *See* Tenn. Code Ann. § 24-7-113(e)(1). Finally, the court found that Mr. F. had not voluntarily abandoned C.A.F., but that he had been prevented from having contact with the child because of the actions of both the Oklahoma Department of Human Services, and the Tennessee Department of Children's Services. *See In re Swanson*, 2 S.W.3d 180 (Tenn. 1999). The court accordingly awarded custody of C.A.F. to Mr. F.

The court also entered a default judgment against Mr. J., terminating his parental rights on the ground of abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1). Ms. Smith's parental rights were terminated on the dual grounds of having committed severe child abuse against a half-sibling of C.A.F., *see* Tenn. Code Ann. § 36-1-113(g)(4), and for being confined in a correctional facility under a sentence of ten or more years, while her child was under eight years of age. *See* Tenn. Code Ann. § 36-1-113(g)(6).

DCS appealed the trial court's final order as to Mr. F. Ms. Smith also appealed. On March 16, 2002, the court granted a stay of its order transferring custody of the child to Mr. F., pending the result of this appeal.

## IV. ARGUMENTS ON APPEAL

The custody rights of parents (including adoptive parents) are jealously guarded by the courts, since those rights have long been considered to have a constitutional dimension. *See O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995); *Stanley v. Illinois*, 45 U.S. 645 (1972). The rights of non-parents are considered to be worthy of less protection, regardless of the quality of the relationship between the non-parent and the child. *See Hawk v. Hawk*, 855 S.W.2d 573 (Tenn.1993).

The trial court based its ruling on a very narrow reading of Tenn. Code Ann. § 24-7-113, to allow Mr. F. to retain the parental status he had obtained as a result of his voluntary acknowledgment of paternity. DCS argues that such a narrow reading of the statute violates the public policy of the state in several important respects, and could lead to absurd results if carried to its logical conclusion. We agree.

## A. THE QUESTION OF STANDING

Tenn. Code Ann. § 24-7-113 establishes a simplified procedure for unmarried fathers to legally establish their paternity without the intervention of the court, by simply executing a voluntary

acknowledgment of paternity. The mother must also sign the acknowledgment, certifying that she is the mother and that the other signatory is the father. The document then becomes the basis for establishing a child support order without the need for a hearing on paternity. Subsection (a) of the statute declares that "[t]he acknowledgment, unless rescinded pursuant to subsection (c), shall be conclusive of that father's paternity without further order of the court."

Subsection (c) sets out time limits within which "[a] signatory to a voluntary acknowledgment shall be permitted to rescind the voluntary acknowledgment." Subsection (e)(1) states that "[i]f the voluntary acknowledgment has not been rescinded pursuant to subsection (c), the acknowledgment may only be challenged on the basis of fraud, whether extrinsic or intrinsic, duress, or material mistake of fact, while subsection (e)(4) states that "[t]he burden of proof in any such proceedings shall be upon the challenger."

The trial court observed that while the statute places the burden of proof upon "the challenger" it does not specify "who is or can be the challenger under said statute." The court construed the language of subsection (c) to be applicable to the entire statute, and stated that the only parties with standing to challenge the acknowledgment are "'the signatories of the voluntary acknowledgment form,' which is limited to the father and the mother."

The Department of Children's Services argues that Tenn. Code Ann. § 24-7-113 must be read in *pari materia* with other statutes relating to the establishment of paternity, and with the rights and responsibilities that flow from that status. Such a reading makes it apparent that the state places a high priority on making sure those rights and responsibilities are based upon an accurate determination of biological parenthood. As the appellee points out, however, in some circumstances, this priority may have to give way to other considerations.

In the present case, considerations of economy (DNA testing is very expensive) and judicial non-interference in family matters have made it possible for a non-parent to legally assume the paternal role under Tenn. Code Ann. § 27-7-113 without scientific proof of actual paternity. Under different circumstances, a child's interest in legitimacy and support creates a common law presumption of paternity in the husband where a child is born to a married couple, no matter how soon the birth follows the marriage. *Shell v. Law*, 935 S.W.2d 402 (Tenn. Ct. App. 1996). In neither of these situations, however, is the presumption of paternity irrebuttable. *See State ex rel Cihlar v. Crawford*, 39 S.W.3d 172 (Tenn. Ct. App. 2000); *Granderson v. Hicks*, App. No. 02A01-9801-JV-00007 (Tenn. Ct. App. Dec. 17, 1998); *Jackson v. Thornton,* 179 S.W. 384 (1915).

The normal operation of Tenn. Code Ann. § 27-7-113 makes it possible for an unwed mother to confer a constitutionally protected parental status upon any male willing to sign a voluntary acknowledgment of paternity. By limiting paternity challenges to the signatories to a voluntary acknowledgment, the trial court would make that status virtually unassailable, even to challenge by

the actual biological father. This is an inappropriate construction of Tenn. Code Ann. § 27-7-113, for it would defeat the clear intent of the paternity statutes.

The appellee argues that if the State is given standing to challenge paternity in this case, then it could do so anywhere and at anytime, thus casting government in the role of potential interloper in every family's private affairs. We do not agree. This case merely stands for the principle that if the state files a Petition for Termination of Parental Rights, it must necessarily have the power to inquire into the authenticity of the claims of parenthood it is seeking to terminate.

## B. THE QUESTION OF FRAUD OR MISTAKE

As we stated above, Tenn. Code Ann. § 27-7-113(e) contemplates challenges to paternity on the basis of fraud, duress, or material mistake of fact. The appellee's counsel strenuously objects to any implication that his client was guilty of fraud, and asks rhetorically against whom the fraud is alleged to have been perpetrated. He contends that when Mr. F. signed the acknowledgment of paternity he did not claim that he knew for a certainty that he was C.A.F.'s father, but merely that he might be, and that in asking him to sign, the mother was laboring under the same state of uncertainty. He also points out that Mr. F. assumed the "moral, financial and ethical commitment to raising the child" when no one else would, and implies that the state should thank him for his willingness to do so, rather than attempting to label his efforts as fraudulent.

We note, however, that Mr. F. did not testify as to any encounter of a sexual kind with Ms. Smith, and that the trial court found her testimony to be unworthy of belief. Further, Mr. F. flatly denied that he was C.A.F.'s biological father when asked by the Oklahoma authorities. Thus, contrary to the counsel's argument, it appears to us that fraud was involved in the execution of the voluntary acknowledgment of paternity. It is apparent that Ms. Smith attempted to perpetrate a fraud upon the state and that she enlisted Mr. F. in this effort. We do not believe that Mr. F. agreed to go along with the fiction out of any selfish motive, but rather that Ms. Smith took advantage of his kind nature and his sympathy for her predicament.

But even if we credited Ms. Smith's testimony, and concluded that she and Mr. F. truly believed that he might be C.A.F.'s father, then the challenge to his paternity would still be effective. The ground of fraud would no longer apply, but the unequivocal results of the D.N.A. tests would indicate a material (and mutual) mistake of fact.

## C. PUBLIC POLICY AND THE ADOPTION STATUTES

-6-

The Department of Children's Services argues that the State has a special duty to protect children, and that this duty is articulated among other places in the adoption statutes, Tenn. Code Ann. § 36-1-101, et seq. The procedures set out in those statutes are specifically designed to protect the interests of children by placing them only with those who have been determined by a court "to be capable of providing proper care and a loving home for an adopted child." Tenn. Code Ann. § 36-1-101(a)(2).

An adoption petition may be preceded by the death of parents, a termination of parental rights, or a surrender of those rights. In any of those situations, a home study of the adoptive parents is required, as is a judicial determination both of their fitness to serve as parents, and of the best interest of the child. DCS contends that Mr. F. used the voluntary acknowledgment of paternity for the impermissible purpose of circumventing the adoption statutes and creating an adoption by estoppel.

Tenn. Code Ann. § 24-7-113 creates a mechanism for establishing paternity without the intervention of the court. Its main purpose is to make it possible to decree child support orders without first having to go through a paternity proceeding. *See* Tenn. Code Ann. § 24-7-113(b)(1). It was not meant to allow a non-parent to obtain parental rights over a child without having to go through an adoption proceeding. We agree with DCS that its use for such a purpose is in violation of the public policy of this state, as unequivocally stated in the adoption statutes.

## V.  MS. SMITH'S APPEAL

The sole argument in Ms. Smith's appeal is that her constitutional rights were violated by terminating her parental rights on the basis of Tenn. Code Ann. § 36-1-113(g)(4), that is, for prior criminal convictions for actions against C.A.F.'s sibling, and not for any action, neglect, or abuse directed against C.A.F. herself. She contends that no consideration was given to the possibility that she could establish a positive relationship with her youngest child.

However, a constitutional challenge that is not timely made in the trial court is waived, except when the challenged statute is so blatantly unconstitutional so as to obviate the necessity for any discussion. *In re: Adoption of Female Child, E.N.R.*, 42 S.W.3d 26 (Tenn. 2001). Ms. Smith did not raise any constitutional questions at the termination hearing. Nor did she give the notice to the attorney general, required under Tenn. R. App. P. 32, "when the validity of a statute, rule or regulation is questioned."

The statute in question allows the termination of parental rights where,

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court

hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

While parents have a fundamental right to the care, custody and control of their children, this right is not absolute, and may be terminated upon a showing that the parent is unfit, or that substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999). We believe a judicial finding of severe child abuse against any child creates an obvious presumption of parental unfitness, and that the incorporation of this presumption into statutory law is not obviously or blatantly unconstitutional.

## VI.

The termination of the parental rights of Ms. Smith and Mr. J. is affirmed. The order of the trial court in regard to the parental rights of Mr. F. is reversed. Remand this cause to the Juvenile Court of Putnam County for further proceedings consistent with this opinion. Tax two-thirds of the costs on appeal to the appellee, Mr. F., and one-third to the appellee Ms. Smith.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.