IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 31, 2003 Session

## IN RE: C.L.J.

**Appeal from the Davidson County Juvenile Court**
**No. 9619-23067      W. Scott Rosenberg, Special Judge**

---

**No. M2003-01949-COA-R9-JV - Filed November 7, 2003**

---

This appeal involves a dispute over the custody of an eight-year-old boy.  The child's parents never married and engaged in a protracted, bitter custody dispute until the father died of cancer in 2003.  Immediately after the father's death, his sister and brother-in-law filed a petition in the Davidson County Juvenile Court seeking custody of the child.  The child's mother opposed the petition, asserting that her custodial rights were superior to those of the boy's aunt and uncle.  The juvenile court granted temporary custody of the child to his aunt and uncle pending a hearing.  The court also determined that the child's mother could not gain custody of her son unless she proved that she would be able to adequately fulfill her parenting responsibilities.  The juvenile court granted the mother's request for an interlocutory appeal, and this court granted the petition to determine whether the juvenile court applied the correct legal standard for custody disputes between a biological parent and non-parents.  We have determined that the juvenile court has not employed the correct standard in this case and that the child's mother is entitled to have custody of her son unless the trial court determines that returning the child to his mother will expose him to a risk of substantial harm.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Juvenile Court**
**Affirmed in Part and Vacated in Part**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ. joined.

Kelli Barr Summers, Brentwood, Tennessee, for the appellant.

J. L. Thompson, III, Nashville, Tennessee, for the appellees.

### OPINION

### I.

C.L.J. was born in June 1994.  His mother, J.A.G., and his father, G. L. J., were not married, and the pregnancy was not planned.  In early 1996, G.L.J. filed a petition in the Davidson County Juvenile Court to establish his parentage, and in March 1996, the court entered an order finding that G.L.J. was C.L.J.'s biological father.  Two months later, the court entered an agreed order giving J.A.G. and G.L.J. joint custody of their son. J.A.G. was designated as the child's primary physical

custodian, and G.L.J. was granted "liberal visitation rights." G.L.J. later moved into a house close to J.A.G.'s house to facilitate his visitation with the child.

As is so often the case, the animosity between J.A.G. and G.L.J. interfered with their ability to cooperate in raising their child. The occasions when G.L.J. exercised his visitation became confrontational and combative. J.A.G. resisted all of G.L.J.'s attempts to take their son out of state to visit relatives despite the provision in the joint custody order permitting him to do so. In July 1999, J.A.G. petitioned the juvenile court to award her "full custody" of C.L.J. because G.L.J. had taken him out of state without her permission. G.L.J. responded with his own request for sole custody, detailing J.A.G.'s interference with his summer visitation rights, his concerns about J.A.G.'s lifestyle and the environment in her home, J.A.G.'s interference with his telephone visitation, and J.A.G.'s violent and abusive conduct when they exchanged the child.

A juvenile court referee entered an "agreed order" on August 12, 1999, modifying the joint custody arrangement. While retaining the joint custody arrangement, the referee determined that the parties would share physical custody of their son equally.[1] The referee also gave each parent defined telephone visitation rights and determined that the parents should cooperate regarding the major life decisions affecting their son.

Despite this order J.A.G. continued to frustrate G.L.J.'s efforts to take C.L.J. out of state to visit his relatives. Less than one week after the entry of the August 12, 1999 order, G.L.J. filed a petition seeking to hold J.A.G. in civil contempt for interfering with his summer visitation, and the referee ordered J.A.G. to relinquish physical custody to G.L.J. immediately. The referee later referred the parties to mediation when J.A.G. insisted that she had not agreed to the August 12, 1999 order. When mediation failed, the referee conducted another hearing, and on November 3, 1999, entered another agreed order that was substantially identical to the August 12, 1999 order.[2]

Approximately one week later, G.L.J. filed another petition seeking to hold J.A.G. in contempt for interfering with his telephone visitation. The petition prompted yet another hearing before the referee, and on January 21, 2000, the referee filed an order stating that "the constant bickering between the parties is detrimental to the child's well-being" and that the child would be placed in "protective custody" should "such virtual warfare continue." The referee also ordered both J.A.G. and G.L.J. to undergo psychological assessments and to follow any recommendations for treatment.

Shortly after the entry of the January 21, 2000 order, C.L.J.'s guardian ad litem requested the juvenile court to order the parties to address the child's unmet medical and dental needs. In April 2000, G.L.J. again requested the juvenile court to grant him sole custody of C.L.J., asserting that allowing J.A.G. to have physical custody could expose him to "potential danger." In support of his

---

[1]The referee determined that each parent would "have one-half of the days and nights each month with their said minor child" and left it up to the parents to decide how to divide up the days.

[2]The primary difference between the two orders involved physical custody. Instead of letting the parents decide how to divide up physical custody, the November 3, 1999 order gave them physical custody on "alternating weeks."

claim, G.L.J. asserted (1) that he was now the child's primary caregiver, (2) that J.A.G. has interfered with his efforts to provide their son with adequate medical and dental care, (3) that J.A.G. had interfered with his efforts to hire a private tutor to help the child with his school work, (4) that the child needed the "influence and direction" of his father, and (5) that J.A.G. was setting a bad example for their son by "having various men in her residence," "watching inappropriate television programs," and refusing to work full time.

The referee conducted another hearing, and on August 30, 2000, entered another agreed order. While this order continued joint custody, it was "joint" in name only. G.L.J. became C.L.J.'s primary physical custodian, and J.A.G. received standard visitation rights. G.L.J. now had authority to make all decisions regarding the child's education and his medical and dental care. In addition, G.L.J. was no longer required to pay child support because he was now the child's primary custodian. Less than one month after the entry of the order, the parties had another confrontation over visitation that resulted in J.A.G. swearing out a domestic violence warrant against G.L.J. and in G.L.J. filing another petition seeking to hold J.A.G. in contempt.

After additional hearings, the referee changed the location where the parties exchanged possession of the child and found J.A.G. in contempt. Less than one month later, the parties were back in court because one of J.A.G.'s male companions had exposed his buttocks to C.L.J. This incident resulted in a referral to the Department of Children's Services, the entry of an agreed order directing J.A.G. to keep her son away from this male companion, and another petition for contempt when G.L.J. discovered that J.A.G. was ignoring the order and telling her son to cover it up. In January 2001, the referee entered an order finding J.A.G. to be in criminal contempt and sentencing her to jail. The referee also limited J.A.G's visitation to four hours of supervised visitation on Saturday and four hours every other Sunday.

The parents' battle continued unabated through 2001 despite the effects it was having on C.L.J..[3] In December 2001, the juvenile court permitted J.A.G. to have ten hours of visitation every other Saturday supervised by her mother. In early 2003, the juvenile court denied J.A.G.'s request to return to the joint custody arrangement that existed prior to the August 30, 2000 order.

G.L.J. was operated on for cancer in January 2003. During his convalescence, his mother and sisters traveled from their homes in Florida to take turns caring for him and C.L.J. G.L.J. eventually decided that his convalescence would be aided by moving to Florida to be closer to his extended family. On April 21, 2003, G.L.J. mailed J.A.G. the statutorily-required notice of his intent to move to Florida with C.L.J. J.A.G. responded on April 30, 2003 by filing a petition for temporary custody. She claimed that C.L.J. was dependent and neglected, that G.L.J. was unable to properly care for C.L.J., and that she had not been treated fairly by the juvenile court referee in the earlier proceedings. G.L.J. replied that his prognosis was good, that he was capable of taking care of himself and C.L.J., and that his immediate family had been providing him support since his surgery

---

[3]In February 2001, C.L.J.'s school reported that he was having "'spells' of seemingly being 'proud' of his failures" and that his "inner attitude" had changed. In February 2002, his teacher noted a change in his behavior and that he was "becoming a disturbance to the class" and that "now it is a struggle to get him to even do . . . [his work]."

and intended to continue providing this support. In response, J.A.G. filed a motion to prevent G.L.J. from removing C.L.J. from the state because his planned relocation was "vindictive" and was intended to "defeat or deter" her visitation rights.

G.L.J. died on July 8, 2003. On July 9, 2003, T.J.S., G.L.J.'s sister, filed a petition for temporary custody in the juvenile court. The referee entered an emergency protective custody order on July 9, 2003 giving temporary custody to T.J.S. after determining that "[b]ased on prior orders [the] court is concerned that mother might not be appropriate placement prior to hearing." On July 10, 2003, T.J.S. and her husband, M.W.S., filed a petition for custody of C.L.J., asserting that J.A.G. had "mental problems" and that she was "unsuitable to have care, custody and control" of C.L.J.

On July 22, 2003, the referee, now sitting as a special juvenile court judge, began hearing the petition of T.J.S. and M.W.S. for custody. J.A.G. insisted that she had "superior rights" to custody of C.L.J. because she was his biological mother and, therefore, she should be given custody immediately unless there was evidence that C.L.J. would be exposed to a substantial risk of harm by being placed in her custody. The court characterized the case as a "hybrid." In light of what it characterized as "valid concerns" regarding J.A.G.'s mental health and ability to fully care for the child, the court determined that J.A.G. would not be entitled to custody of her son unless she proved "a substantial and material change in circumstances *affecting her ability to parent*."[4] The court also noted that "[i]f . . . [J.A.G.] can present sufficient evidence to show that her circumstances have changed such that she will reasonably be able to adequately fulfill her parenting responsibilities then custody will be returned to her without a 'best interests' determination between . . . [J.A.G.] and . . . [T.J.S. and M.W.S.]." At the conclusion of the July 24, 2003 hearing, the court granted J.A.G.'s request for a continuance to give her additional time to obtain evidence and ordered that the hearing would resume on December 22, 2003. In the meantime, the court directed that C.L.J. remain in the custody of T.J.S. and M.W.S.

Thereafter, the juvenile court entered an order sua sponte inviting either party to apply to this court for an interlocutory appeal pursuant to Tenn. R. App. P. 9. J.A.G. filed an application for permission to appeal with this court, and on August 21, 2003, this court granted the application and established an accelerated briefing and argument schedule. We limited the issue on appeal to whether the juvenile court had applied the correct legal standard for custody disputes between parents and non-parents.

## II.

Biological parents have a fundamental, constitutionally protected right in the care and custody of their children. *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060 (2000); *Gallaher v. Elam*, 104 S.W.3d 455, 461 (Tenn. 2003); *In re C.A.F.*, 114 S.W.3d 524, 531 (Tenn. Ct.

---

[4]The emphasis was added in the juvenile court.

App. 2003).[5]  Their rights are superior to all others, including the members of their extended families and the government,[6] and continue without interruption unless a biological parent relinquishes them, abandons them, or engages in conduct justifying their modification or termination.  *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *Stokes v. Arnold*, 27 S.W.3d 516, 520 (Tenn. Ct. App. 2000); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995).

The constitutional weight of a biological parent's custodial rights colors custody determinations.  When adjudicating initial custody disputes between a biological parent and a non-parent, the courts must find that the biological parent's rights are superior unless granting the biological parent custody will expose the child to a substantial risk of harm.[7]  *In re Askew*, 993 S.W.2d 1, 4 (Tenn. 1999); *In re Adoption of Female Child*, 896 S.W.2d 546, 548 (Tenn. 1995).  The burden of demonstrating the existence of a substantial risk of harm is on the party opposing the biological parent's custody claim.  *Hall v. Bookout*, 87 S.W.3d 80, 86 (Tenn. Ct. App. 2002).

However, a biological parent cannot invoke his or her superior custodial rights when seeking to modify an existing, otherwise valid, order granting custody to a non-parent.  Such an order reflects a studied judicial determination that the child's interests will be served best by placing him or her in the custody of someone other than a biological parent.  In that circumstance, and in that circumstance alone, a biological parent seeking custody must demonstrate (1) that a material change in circumstances has occurred and (2) that changing custody is in the child's best interests.  *Blair v. Badenhope*, 77 S.W.3d at 148.

In this case, the juvenile court declined to accord J.A.G. the benefits of the superior rights doctrine because she had lost primary physical custody of C.L.J. to G.L.J. in an earlier proceeding.  However, the resolution of a custody dispute between biological parents cannot, by definition, implicate the superior rights doctrine because each parent's rights have the same constitutional magnitude.  Thus, the prior custody adjudication between J.A.G. and G.L.J. is not analogous to the initial custody order in *Blair v. Badenhope* that awarded custody to the child's maternal grandmother and should not be given the same legal significance.

---

[5]These rights exist notwithstanding the marital status of the biological parents as long as the biological parent has established a parental relationship with the child.  *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).  Adoptive parents have the same parenting rights as biological parents.  *Simmons v. Simmons*, 900 S.W.3d 682, 684 (Tenn. 1995).

[6]*Skerrett v. Association for Guidance, Aid, Placement and Empathy, Inc.*, No. M2002-00218-COA-R3-JV, 2003 WL 21634412, at *4 (Tenn. Ct. App. July 11, 2003) (No Tenn. R. App. P. 11 application filed) (grandparents); *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 182 (Tenn. Ct. App. 2000) (government).

[7]We have explained that "substantial risk of harm" has the following two facets:

First, it connotes a real hazard or danger that is not minor, trivial, or insignificant.  Second, it indicates that the harm must be more than a theoretical possibility.  While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d at 732.

What the juvenile court currently has before it is an initial petition for custody filed by persons who are not C.L.J.'s biological parents. J.A.G., the child's biological mother, has never relinquished custody to a non-parent, nor has a court previously awarded custody of C.L.J. to a non-parent. Accordingly, J.A.G. is entitled to invoke the superior rights doctrine. She cannot be deprived the custody of C.L.J. unless the court finds, by clear and convincing evidence, that placing C.L.J. in her custody will expose him to a substantial risk of harm.

The juvenile court erred by imposing upon J.A.G. the burden of demonstrating a material change in her parenting skills to forestall comparing her fitness as a parent with that of T.J.S. and M.W.S.. Unless T.J.S. and M.W.S. present clear and convincing evidence that returning C.L.J. to his mother will expose him to a substantial risk of harm, the court must give J.A.G. custody of her child. Parental fitness is an essential ingredient in any inquiry into whether a particular custody arrangement could expose a child to a substantial risk of harm. *Hall v. Bookout*, 87 S.W.3d at 86. Accordingly, the court may decline to grant custody of C.L.J. to J.A.G. if it determines that she is currently unfit to be his custodial parent. *Troxel v. Granville*, 530 U.S. at 68-69, 120 S. Ct. at 2061 ("[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."); *Ray v. Ray*, 83 S.W.3d at 732 ('[A] biological parent cannot be denied custody unless he or she is found to be unfit.").

## III.

We affirm the portion of the July 31, 2003 order granting T.J.S. and M.W.S. temporary custody of C.L.J. pending the completion of the pending custody proceeding. However, we vacate the portion of the July 31, 2003 order placing the burden on J.A.G. to demonstrate a material change in her parenting skills and remand the case for further proceedings consistent with this opinion. We tax the costs of this appeal to T.J.S. and M.W.S. for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.