# THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 16, 2024 Session

## JIMMY MOATS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Coffee County**
**No. 2023-CR-48884    William A. Lockhart, Judge**

_____

### No. M2023-01296-CCA-R3-PC

_____

The Petitioner, Jimmy Moats, appeals from the Coffee County Circuit Court's denial of post-conviction relief from his guilty-pleaded convictions to kidnapping and evading arrest. On appeal, the Petitioner contends that the post-conviction court erred by denying relief on his ineffective assistance of trial counsel claim, which he asserts resulted in unknowing and involuntary guilty pleas. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Drew Justice, Murfreesboro, Tennessee, for the appellant, Jimmy Moats.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Craig Northcott, District Attorney General; Jason Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Although the indictment, the guilty plea hearing transcript, the plea agreement, and the judgments of convictions are not included in the appellate record, the May 22, 2023 petition for post-conviction relief states that on November 7, 2022, the Petitioner was indicted for especially aggravated kidnapping, aggravated assault, evading arrest with the risk of death, and reckless endangerment with a deadly weapon. *See* T.R.A.P. 24(b); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983) (The defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal.). The petition states that on March 22, 2023, the Petitioner pleaded

guilty to kidnapping and evading arrest in exchange for the dismissal of the remaining charges and that he received an effective three-year sentence at 30% service. The petition states that the circumstances giving rise to the indictment were related to the Petitioner's assaulting his "wife" by biting her, taking their infant child from the wife, and leading the police on a "dangerous high-speed chase." The Petitioner was arrested when he returned home with the child.

The Petitioner asserted in his petition that trial counsel provided ineffective assistance by failing to investigate and to speak with the Petitioner's wife. He argued that his wife unsuccessfully attempted to contact counsel to explain that the Petitioner "did not really assault her" and that the Petitioner was innocent of the charges. He argued, as well, that he could not have kidnapped his own child and that he took the child "because the child's mother was acting erratic" and because he wanted to protect the child. The Petitioner also asserted that his guilty pleas were unknowing and involuntary because he pleaded guilty to kidnapping based upon counsel's advice that he faced a significant likelihood of conviction for especially aggravated kidnapping and because he was unaware of his wife's favorable testimony. The Petitioner asserted that if counsel had properly advised him regarding his parentage defense to the especially aggravated kidnapping charge and had spoken with his wife during counsel's investigation, he would not have pleaded guilty.

At the August 9, 2023 post-conviction hearing, post-conviction counsel clarified for the post-conviction court that counsel mistakenly believed the child's mother was the Petitioner's wife and that counsel had since learned they were not married at the time of the offenses. Counsel said the Petitioner did not want to "retract the claim" that he was the child's biological father, but counsel clarified that counsel did not "call the child [the Petitioner's] biological child. It is [the Petitioner's] child." Counsel said that "the best way to say it" was the child was the Petitioner's "legal child."

In argument before the post-conviction hearing proof, the Petitioner asserted that he was innocent of especially aggravated kidnapping as a matter of law because he could not kidnap his own child without force, coercion, or fraud, none of which the State had alleged in the indictment. The Petitioner argued that trial counsel failed to file a motion to dismiss the especially aggravated kidnapping charge pursuant to *State v. Goodman*, 90 S.W.3d 557 (Tenn. 2002), and that counsel provided erroneous advice that the Petitioner could be convicted of the kidnapping charge, which resulted in involuntary guilty pleas. At this juncture, the post-conviction court took judicial notice of the "underlying case" file, which we note is, likewise, not included in the appellate record. *See* T.R.A.P. 24(b); *Bunch*, 646 S.W.2d at 160.

Trial counsel testified that the most serious charge against the Petitioner was the especially aggravated kidnapping of the child, whose name was Jimmy Moats III. Counsel

said that during their first meeting, the Petitioner said he was the father of the child but clarified he was not the biological father, although his name was on the child's birth certificate, which counsel never saw but had no reason to doubt. When asked if the Petitioner had "acknowledged paternity of the child," counsel stated that although the Petitioner was not the biological father, the Petitioner "simply signed the birth certificate and wanted to be the father of the child." Counsel said that an adoption had not occurred and that the Petitioner and the mother had not been married. Counsel concluded that although the Petitioner signed the birth certificate, the Petitioner was not the "legitimate father of the child." Counsel agreed that the Petitioner "was at the very least trying to act" as the child's father but stated that she did not research how parents' names were placed on birth certificates involving voluntary acknowledgments of paternity.

Trial counsel testified that, according to the police report, the mother of the child stated that the Petitioner took the child from her, that the Petitioner was not the father of the child, that the Petitioner's name appeared on the birth certificate, that the Petitioner placed the child inside the car against the mother's wishes, and that the Petitioner drove away with the child. Counsel said that she concluded the Petitioner was not the legal father of the child, that she explained her conclusion to the Petitioner, and that she provided the Petitioner with caselaw and paternity guidelines from the Tennessee Department of Human Services to show he was not the legal father without an adoption. Counsel stated that she explained to the Petitioner that especially aggravated kidnapping was a Class A felony, that the minimum sentence would be fifteen years, and that he would be required to serve 100% of any sentence imposed.

On cross-examination, trial counsel testified that she had reviewed the petition for post-conviction relief, which reflected the Petitioner's notarized signature under oath and which stated that the mother of the child was the Petitioner's wife and that the child was "his child." Counsel agreed that the petition was drafted with the assistance of post-conviction counsel. When asked if a voluntary acknowledgment of paternity was a sworn statement, counsel said that she did not conduct much research on this topic. Counsel said she relied upon the information provided by the Petitioner to determine that he was not the biological father and that he and the child's mother were not married. Counsel said that as a result, she encouraged the Petitioner to forego a trial for especially aggravated kidnapping.

The voluntary acknowledgment of paternity was received as an exhibit and reflected that the Petitioner signed the form, affirming that he was the child's biological father. The voluntary acknowledgment states that it "may only be signed by the birth mother and the biological father." The child's certificate of live birth was, likewise, received as an exhibit and reflected that the Petitioner was the child's father.

-3-

Trial counsel testified that although the child's mother told the police the Petitioner wanted to be the child's father, the Petitioner's acting as the child's father was "not enough . . . to establish paternity, particularly when it came to a Class A felony." Counsel agreed that the Petitioner's and the child's mother's signing the acknowledgment of paternity could result in legal penalties because the voluntary acknowledgment states that the form can only be signed by the birth mother and biological father. Counsel said that she and the Petitioner discussed that the Petitioner and the child's mother had not taken any legal steps to have the Petitioner become the legal father.

Trial counsel testified that, according to the police report, the child's mother stated that the Petitioner had been intoxicated, that they had argued, that the Petitioner had taken the child to the car, that "they pushed and pulled" the baby carrier, that the mother unsuccessfully attempted to "unbuckle the infant from the car seat," and that the Petitioner "absconded from there with her car." Counsel said that the Petitioner returned to the home, that the police were already at the home, that the Petitioner fled the home, and that the police chased the Petitioner. Counsel recalled that the Petitioner told the police he ran because he knew he would go to jail. Counsel said that she obtained the police communication report to determine the length of the chase, that the chase did not last a long time, and that the police were concerned about the child. She said the report showed that the Petitioner was gone for more than three hours, which counsel believed was a fact the prosecution "would drive home during any trial." When asked if she recalled evidence related to the Petitioner's telling the child's mother that she would never see the child again if the police were present when he returned home, counsel stated, "There was some true concern about what he may do to the child."

Trial counsel testified that photographs of the child's mother showed "a small mark on one of her cheeks" and that the injury did not constitute serious bodily injury. Counsel said the Petitioner told the police that the Petitioner bit the child's mother on the face earlier in the day during sexual intercourse. Counsel said the child's mother contacted counsel's office requesting to speak about the Petitioner's case. Counsel said that she spoke with the Petitioner's father and that she understood the child's mother did not "want to go forward with the prosecution." Counsel thought she explained to the Petitioner and his father that the State would continue the prosecution even if the child's mother did not want to participate. Counsel said that she explained the Petitioner's sentencing exposure began with fifteen to twenty-five years at 100% service and that she negotiated a plea agreement of three years at 30% service. She said she advised the Petitioner to accept the offer because she thought it was in the Petitioner's best interests.

The Petitioner testified that the child was "my stepson. I am not biologically the father, but I'm on the birth certificate as the father." The Petitioner said that he viewed himself as the child's father and that "[a]t the hospital when [the child's mother] and I had our son, we agreed, and I had signed the birth certificate at the hospital." He identified the

-4-

voluntary acknowledgment of paternity and certificate of live birth and stated that he told trial counsel about these documents but that counsel advised him that he had "no rights to take the child" because he was not the biological father and had not adopted the child. The Petitioner said he had since learned from post-conviction counsel that the Petitioner had "rights to the child as the father for signing the birth certificate." The Petitioner said that if he had known he could not have been convicted of especially aggravated kidnapping, he would not have pleaded guilty and would have proceeded to a trial. The Petitioner explained that he was most concerned about the especially aggravated kidnapping charge because he wanted to be a part of the child's life and because he did not want a conviction on his record. He agreed that counsel explained the charge carried a sentence of fifteen to twenty-five years.

The Petitioner testified that on the night of the offenses, the child's mother "was schizophrenic," that he found "suicide letters," that she "threatened to walk down a dark street with our infant son at four months old," and that "for [the child's] safety, I felt the need to put him in safety." The Petitioner recalled that the weekend before the offenses, the child's mother walked down the street at night without the child and was almost struck by a car. He noted that they lived in a rural area with poor lighting. The Petitioner said that based upon this previous incident, he believed the child's mother would put herself and the child in danger if he did not intervene. The Petitioner denied hurting or assaulting the child's mother and said the small injury was caused when the child's mother "turned around and took her face and hit me in the mouth with her face," which "left a mark on her cheeks." He explained that the child's mother went outside "with the child in the car seat" and that he "had the car seat." He said that they were not "jerking the car seat" but that "she stopped" when he asked her to "stop." He said that he permitted the child's mother to leave but that he did not allow her to "take our son down the street." He said that when she turned around, she "takes the side of her cheek and hits me in the mouth[] with her face." He said that at this juncture, she began to unbuckle the child from the car seat. He said that he was ultimately able to secure the child inside the car and that he did not endanger the child. He said that as the child's mother was on the telephone with 9-1-1, he held the child, returned the child to the car seat, buckled the child inside the car, and left.

The Petitioner testified that he did not drive erratically or dangerously and that he did not evade arrest. He denied that he saw "blue lights" and said that he parked the car in his father's driveway "right below our place," that he sat inside the car for twenty-five minutes, that he left, and that he made a left turn at a stop sign. He said that a car followed behind him at the stop sign but that he saw no indication it was a police car. The Petitioner said that the car followed him for about one mile, that he drove into a driveway, and that the car continued driving. The Petitioner believed that he had strong potential defenses to the remaining charges in the indictment. He noted that twenty to twenty-five years before this case, he was convicted of possession of drug paraphernalia and driving while his license was suspended.

On cross-examination, the Petitioner testified that he signed the voluntary acknowledgment of paternity affidavit, swearing under oath and penalty of perjury that he was the biological father of the child. He agreed that he reviewed the affidavit before signing it. He denied lying and said that he was the child's father. He stated that post-conviction counsel did not review the statutory definition that a father is the biological father of a child and that he agreed he was not the biological father. He agreed that trial counsel advised him that he was not the biological father, although he had falsely attested he was the biological father in the voluntary acknowledgment, that he had not adopted the child, and that, as a result, he possessed no legal rights to the child. He agreed that he had never been a party to proceedings to obtain parental rights of the child or to establish visitation but said that "[i]t was never an issue to go to court to have custody rights established."

The Petitioner testified that the police officer arrived at his home while he sat inside his car in his father's driveway. He denied "slinging gravel." He denied increasing speed when the car followed him for about one mile and said that the car never turned on any blue lights. He denied driving recklessly. He said that he received a telephone call from the child's mother during the incident but denied that he told her he was unsure who he wanted to lose, her or the child. He said he told her that if he could not have her and the child, who were his "world," he "had nothing else to live for." He denied that he had been drinking alcohol and that he told the police he had been drinking and made a poor decision to drive with the child inside the car. The Petitioner stated when he spoke to the child's mother on the telephone, he asked the child's mother to write a statement consistent with their agreement at the time of the child's birth. He said he wanted her statement to read, "We will raise our son together. We will have equal rights, and I will not take my son from you." He denied that he wanted the statement written before he would return home but acknowledged he requested the statement during the three hours the police searched for him and the child.

The Petitioner testified that he would have proceeded to a trial

for the simple fact that if my child is in danger, I have a right, even if I'm not on the birth certificate, . . . I can't let a child get hurt, so if me stepping up and putting the child in a better position than getting harmed, yes, because it was what I reside on my property, so if somebody, including [the child's mother] or that child would have got hurt, and I would not have got help or put them in a better position where they wasn't getting hurt, I would have been responsible, so I feel like I was responsible for that's kid's well-being, regardless -- so yes. I would take it to trial.

-6-

On redirect examination, the Petitioner testified that he was responsible for the child's welfare. The Petitioner read a portion of Tennessee Code Annotated section 24-7-113(a) (Supp. 2022), which states, in relevant part,

> A voluntary acknowledgment of paternity which is completed under § 68-3-203(g), § 68-3-302, or § 68-3-305(b), by an unwed father or under similar provisions of another state or government shall constitute a legal finding of paternity on the individual named as the father of the child in the acknowledgment, subject to rescission as provided in subsection (c).[1]

The Petitioner stated that if he had known the voluntary acknowledgment was "conclusive establishment that [he was] the legal father," he would have pleaded not guilty and proceeded to a trial.

At the close of the proof, the Petitioner abandoned his allegation of ineffective assistance related to the child's mother's recantation. The post-conviction court noted that the Petitioner had not presented any evidence related to this allegation, and post-conviction counsel informed the court that the child's mother had moved to Massachusetts, which was "very subpoena unfriendly." *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Counsel said that the Petitioner was proceeding on the ineffective assistance claim that trial counsel "incorrectly gave [the Petitioner] the advice that he was not the legal father when this statute, 24-7-113, conclusively . . . establishes that he was." Counsel argued that whether the Petitioner committed perjury when completing the voluntary acknowledgment of paternity was irrelevant unless the voluntary acknowledgment was rescinded within the statutory sixty-day limitations period, which had not been done in this case.

When the post-conviction court questioned whether the Petitioner was eligible to sign the voluntary acknowledgment of paternity, noting the form explicitly stated only a biological father was permitted to sign it, post-conviction counsel argued, in relevant part, that after a person signs the voluntary acknowledgment, the person "really can't get off the hook in most scenarios" and that even if the person were not a biological father, the signatory was "the father from there on out in the eyes of the law." Counsel did not concede that the Petitioner had committed perjury by signing the affidavit, arguing the Petitioner had not fully "understood." Counsel argued, though, that even if the Petitioner had an intent to deceive, the voluntary acknowledgment "still conclusively makes [the Petitioner] the legal father." Counsel argued that because the Petitioner was the child's legal father,

---

[1] Subsection (c) addresses the two circumstances in which a signatory to a voluntary acknowledgment of paternity is permitted to rescind the acknowledgment. *See* T.C.A. § 27-7-113(c)(1)(A), (B). Both circumstances require action within sixty days of the date of completion of the voluntary acknowledgment. The Petitioner and the child's mother executed the voluntary acknowledgment on June 7, 2022.

the Petitioner could not have been convicted of any form of kidnapping, which was an issue trial counsel failed to investigate. The court questioned whether the Petitioner was permitted to use a fraud in which he knew he was not the biological father as a criminal defense.

The post-conviction court entered a written order denying post-conviction relief. The court found that the especially aggravated kidnapping charge "was the main concern" for trial counsel and the Petitioner. The court found that counsel and the Petitioner discussed his legal relationship with the child because of the "possible defense" that the Petitioner was the child's father, which would have exempted the Petitioner from a prosecution for especially aggravated kidnapping. The court found that based upon their discussion, counsel determined that the Petitioner was not the biological father, that the parties were not married when the child was born, but that the Petitioner had signed a voluntary acknowledgment of paternity and was listed as the father on the birth certificate. The court found that counsel investigated whether a person who was not a biological father and who was not married to the mother was permitted to sign a voluntary acknowledgment and that counsel determined that the Petitioner was not permitted to sign the form. The court found that as a result, counsel began plea negotiations, which resulted in a three-year sentence for kidnapping and evading arrest. The court found that if the Petitioner had been convicted of especially aggravated kidnapping, he would have been sentenced as a Range II offender as required by statute and faced a possible sentence of twenty-five to forty years' confinement.

The post-conviction court found that trial counsel determined a plea agreement was in the Petitioner's best interest based upon the discovery, the Petitioner's not being the child's biological or legal father, and a possible lengthy sentence for an especially aggravated kidnapping conviction. The court found that counsel discussed her determination with the Petitioner after investigating the child's relationship with the Petitioner. The court found that the Petitioner admitted he was not the biological father of the child, was not married to the child's mother, and knowingly and falsely executed the voluntary acknowledgment of paternity at the hospital declaring he was the biological father of the child.

The post-conviction court determined that this case was distinguishable from *State v. Goodman*, 90 S.W.3d 557 (Tenn. 2002), in that the parties in *Goodman* did not dispute the defendant was a father of the minor child. The court found that the Petitioner's only claim to parentage was the falsely signed voluntary acknowledgment of paternity. The court noted that the Tennessee Court of Appeals determined Tennessee Code Annotated section 24-7-113 created a mechanism for establishing paternity without court intervention to "decree child support orders without having to go through a paternity proceeding." *See In re C.A.F.*, 114 S.W.3d 524, 530 (Tenn. Ct. App. 2003); *see also* T.C.A. § 24-7-113(b)(1). Relying on *In re C.A.F.*, the post-conviction court determined that the statutory authority

-8-

relied upon by the Petitioner was not intended to permit a non-parent to obtain parental rights without having to go through an adoption proceeding.

The post-conviction court determined that the Petitioner was not a parent of the child and that he falsely executed the affidavit on the voluntary acknowledgment of paternity under penalty of perjury by stating he was the biological father of the child. The court concluded that any presumption given to the voluntary acknowledgment was overcome by the undisputed fact that the Petitioner's voluntary signature on the acknowledgment was, at worst, fraud or, at best, mistake of fact. The court concluded that the Petitioner failed to establish he was a parent of the child and that, as a result, a motion to dismiss the especially aggravated kidnapping charge on this basis would have been unsuccessful. The court, therefore, determined that the Petitioner failed to establish trial counsel provided any deficient performance resulting in prejudice. This appeal followed.

The Petitioner contends that the post-conviction court erred by concluding that the Petitioner failed to establish his ineffective assistance of trial counsel claim. He argues that he is the legal father of the child, that counsel erroneously advised he could be prosecuted for especially aggravated kidnapping of the child, and that his guilty pleas were unknowingly and involuntarily entered based upon counsel's erroneous advice. The State responds that the Petitioner is not entitled to relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove

either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

As a preliminary matter, the State asserts that the Petitioner has failed to present an adequate record to facilitate appellate review. The Petitioner asserts that because he is the child's legal father, he could not be prosecuted for especially aggravated kidnapping in the absence of force, threat, or fraud pursuant to *State v. Goodman*, in which our supreme court concluded that a father of a minor child cannot be subject to prosecution for "especially aggravated kidnapping under Tennessee Code Annotated section 39-13-305(a)(2)" when the "indictment does not allege that the minor child was removed or confined by force, threat, or fraud." 90 S.W.3d at 565. However, the appellate record does not include the indictment, guilty plea hearing transcript, the plea agreement, or judgments of conviction.

-10-

*See* T.R.A.P. 24(b); *Bunch*, 646 S.W.2d at 160. Furthermore, although the post-conviction court took judicial notice of the trial court record, the contents of what occurred during the trial court proceedings are, likewise, not included in the appellate record. The Petitioner did not appeal from the conviction proceedings, and as a result, a previous appellate record does not exist.

The Petitioner asserts in his reply brief that the appellate record is sufficient because the "exhibits and technical record were transmitted perfectly" but acknowledges that the record does not contain the indictment and judgments of conviction. The Petitioner argues that the testimony at the post-conviction hearing shows that the State did not allege in the indictment that the Petitioner used force, threat, or fraud to commit especially aggravated kidnapping. Alternatively, the Petitioner asserts that if the record were inadequate to facilitate appellate review, the proper remedy is to remand his case to the post-conviction court for additional findings of fact and conclusions of law.

Again, the Petitioner has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d at 160; T.R.A.P. 24(a), (b). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, in the absence of a fair, accurate, and complete record, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993).

The Petitioner's ineffective assistance of trial counsel claim is premised, in part, upon his position that he is the child's legal father and, in part, upon the language of the especially aggravated kidnapping allegation in the indictment, which is not included in the appellate record. As a result, this court cannot first determine, pursuant to *Goodman*, whether the State alleged in the indictment that the Petitioner committed especially aggravated kidnapping by knowingly removing or confining by force, threat, or fraud a child under the age of thirteen. *See* T.C.A. §§ 39-13-302(a) (2018) (false imprisonment); 39-13-305(a)(2) (2018) (especially aggravated kidnapping); *see also Goodman*, 90 S.W.3d at 565. Although post-conviction counsel argued at the evidentiary hearing and at oral argument in this court that the State had not alleged removal or confinement by force, threat, or fraud, arguments of counsel are not evidence. *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). The Petitioner had an obligation to include in the record a complete account of what transpired in the trial court relative to the issues he has raised on appeal, which in this case minimally included the indictment. Further, although this court questioned counsel about the adequacy of the record at oral argument, the Petitioner has not sought to supplement the record with the indictment, along with the guilty plea

agreement, the guilty plea hearing transcript, and the judgments of conviction to "convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." T.R.A.P. 24(a). Because the record is incomplete and does not contain materials and proceedings relevant to the issue raised on appeal, this court is precluded from considering the Petitioner's ineffective assistance claim and must "conclusively presume that the ruling of the [post-conviction] court was correct in all particulars." *Miller*, 737 S.W.2d at 558. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE