# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs October 1, 2024

## IN RE DOROTHY A. ET AL.

**Appeal from the Juvenile Court for Dickson County**
No. 10-21-145-TPR          Jerred A. Creasy, Judge
_____

**No. M2023-01511-COA-R3-PT**
_____

In this case involving termination of the father's and mother's parental rights to two of their minor children, the trial court determined that two statutory grounds had been proven as to each parent by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the father's and mother's parental rights was in the children's best interest. The father and mother have each appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY ARMSTRONG, JJ., joined.

Ashley Preston, Nashville, Tennessee, for the appellant, Abigail A.

Matthew A. Bromund, Dickson, Tennessee, for the appellant, Austin A.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. Factual and Procedural Background

This case involves termination of the parental rights of Abigail A. ("Mother") and Austin A. ("Father") to their minor children, Dorothy A. and Bella A. (collectively, "the Children"). On May 17, 2019, the Dickson County Juvenile Court ("trial court") found the

Children to be dependent and neglected in the custody of the parents and placed the Children into the custody of the Tennessee Department of Children's Services ("DCS"). At that time, the Children were ages two years and one year, respectively. DCS's involvement with the family actually began in 2018 due to environmental concerns in the home, and the Children were initially placed in the custody of Michael S. ("Grandfather") and Jennifer S. ("Grandmother") (collectively, "Grandparents") in March 2019, as the result of psychological evaluations performed respecting the parents at the behest of DCS. However, following an incident of violent behavior by Mother toward Dorothy in the residence that the parents shared with Grandparents, the Children were removed from that home and placed into foster care in May 2019.

On October 26, 2021, DCS filed a petition to terminate Mother's and Father's parental rights to the Children in the trial court. In its petition, DCS alleged that the parents had failed to provide a suitable home for the Children despite reasonable efforts by DCS during the twenty-nine months the Children had been in DCS custody. DCS also alleged that the parents had failed to substantially comply with their permanency plans and that the conditions leading to the Children's removal from the parents' custody persisted. In addition, DCS asserted that the parents were mentally incompetent to parent the Children due to the fact that each parent had been diagnosed with an intellectual disability affecting his or her ability to care for the Children, which was unlikely to be improved over time. Finally, DCS averred that the parents had failed to manifest an ability and willingness to care for the Children and that termination of their parental rights was in the Children's best interest.

On November 30, 2021, Father and Mother filed a joint motion seeking to dismiss the petition to terminate their parental rights, arguing, *inter alia*, that termination on the basis of their disabilities violated the United States Constitution, the Tennessee Constitution, and the Americans with Disabilities Act. The parents also argued that the termination petition was factually deficient. On that same date, the trial court entered an order appointing a guardian *ad litem* for the Children. The court concomitantly appointed separate counsel for Mother, finding that Mother did not have the capacity to waive any conflict of interest presented by being represented by the same attorneys who were representing Father. The trial court subsequently entered an order denying the parents' joint motion to dismiss and requiring DCS to file an amended petition containing more specific facts.

On April 5, 2022, DCS filed an amended petition to terminate Mother's and Father's parental rights. In this amended petition, DCS included additional factual allegations but relied upon the same statutory grounds for termination as were stated in the original petition. Mother and Father subsequently filed a joint motion to dismiss the amended petition, again arguing that the petition lacked sufficient facts and placed inordinate emphasis on the parents' disabilities. On November 28, 2022, Father's attorneys filed a motion seeking leave of court to withdraw from the matter, stating that Father had "fired"

- 2 -

them.  The trial court granted the attorneys' withdrawal motion and appointed substitute counsel to represent Father.

On June 28, 2023, Father and Mother filed a joint answer to the amended termination petition, denying that statutory grounds for termination existed or that termination was in the Children's best interest.  Father and Mother subsequently filed a joint pretrial brief.

The trial court conducted a bench trial concerning the termination petition, spanning five non-consecutive days in August 2023.  On September 28, 2023, the court entered an order terminating Mother's and Father's parental rights.  In that order, the court elucidated that DCS had dismissed the grounds of abandonment by failure to provide a suitable home and substantial noncompliance with the permanency plans, proceeding to trial on only the following statutory grounds:  (1) persistence of the conditions leading to removal of the Children, (2) mental incompetence, and (3) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.

The trial court determined that DCS had not proven the ground of persistent conditions by clear and convincing evidence.  With respect to the ground of mental incompetence, the court found that DCS had proven that Mother and Father were mentally incompetent to provide care for the Children and that this was unlikely to change.  The court also found that no amount of training, education, or counseling would enable the parents to successfully parent the Children.  In support, the court emphasized that the Children have special needs and that an expert witness, William Beyer, had opined that the parents did not maintain the ability to develop the requisite skills to parent the Children.  The court also considered the testimony of other witnesses who had observed the parents with the Children and noted their concerns about inconsistent feeding, improperly buckling the Children into car seats, and exhibiting an inability to assist Bella in donning her orthotic suit.  The court concluded that "all the proof in this case has been consistent with what Mr. Beyer's findings have been," resulting in proof that was clear and convincing regarding this ground.

Finally, the trial court determined that DCS had proven, by clear and convincing evidence, the statutory ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.  The court found that although the parents clearly manifested a willingness to care for the Children, they did not have the ability to do so.  The court also found that placing the Children in the custody of the parents would pose a risk of substantial harm to the Children, particularly due to the Children's special needs and the parents' limitations.  The court noted that although the Children had remained in DCS custody for nearly four years, Mother and Father had been unable to progress to the level of exercising unsupervised visitation.

- 3 -

After analyzing the applicable best interest factors and making specific findings as to each by clear and convincing evidence, the trial court concluded that the parents' parental rights should be terminated. Father and Mother each timely appealed.

## II. Issues Presented

Mother presents the following issues for this Court's review, which we have restated slightly:

1.      Whether the trial court erred by determining that clear and convincing evidence supported the statutory ground of mental incompetence concerning Mother.

2.      Whether the trial court erred by determining that clear and convincing evidence supported the statutory ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children concerning Mother.

Father presents the following additional issues for this Court's review, which we have also restated slightly:

3.      Whether the trial court erred by determining that clear and convincing evidence supported the statutory ground of mental incompetence concerning Father.

4.      Whether the trial court erred by determining that clear and convincing evidence supported the statutory ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children concerning Father.

5.      Whether the trial court erred by determining that termination of Father's parental rights was in the Children's best interest.

6.      Whether Tennessee Code Annotated § 36-1-113 is constitutionally invalid because it does not meet the strict scrutiny test for equal protection of disabled persons and their fundamental right to parent.

7.      Whether Tennessee Code Annotated § 36-1-113 is constitutionally invalid because it does not meet the strict scrutiny test for due process of law and is unconstitutionally vague regarding the proof necessary to terminate the parental rights of a disabled person.

DCS presents an additional issue for this Court's review:

8.      Whether Father has waived his challenge to the constitutionality of Tennessee Code Annotated § 36-1-113.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of

unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

### IV. Constitutionality of Statute

With regard to the statutory ground concerning mental impairment, Tennessee Code Annotated § 36-1-113(g)(8) (West July 1, 2021, to current) provides:

(A)   The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B)   The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

- 6 -

(i)  The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii)  That termination of parental or guardian rights is in the best interest of the child;

(C)  In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

In his appellate brief, Father argues that Tennessee Code Annotated § 36-1-113(g)(8) is unconstitutional because it denies equal protection and due process to disabled parents. DCS contends that Father has waived this argument by failing to raise it in the trial court. We agree with DCS.

In their joint motions to dismiss, the parents made general allegations that "[t]erminating parental rights on the basis of a disability violates the United States and Tennessee Constitutions" as well as various statutes addressing discrimination on the basis of a disability. However, our review of the record has revealed no instance when Father specifically challenged the constitutionality of Tennessee Code Annotated § 36-1-113(g)(8) during the trial court proceedings before raising the issue in his appellate brief.

In a prior action wherein a party raised an issue regarding the constitutionality of a statute on appeal to this Court without having first raised it before the trial court, our Supreme Court determined that this Court had erred by considering the constitutional challenge on appeal. *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983) ("It was error for [the Court of Appeals] to adjudicate the constitutional issue because that question had not been raised at any point in the proceedings in the trial court."). Similarly, in the subsequent case of *In re Adoption of E.N.R.*, 42 S.W.3d 26, 29 (Tenn. 2001), the respondent parent in a termination proceeding raised a constitutional challenge to Tennessee Code Annotated § 36-1-113(g)(6) solely during closing argument at trial. On appeal, this Court declined to address the constitutional challenge, and the Supreme Court ultimately determined that the constitutional challenge had been waived, stating:

We are of the opinion that there is little difference between an issue improperly raised before the trial court at the last minute and one that was

not raised at all. *See Mallicoat v. Poynter*, 722 S.W.2d 681, 682 (Tenn. Ct. App. 1986) ("The jurisdiction of this court is appellate only and we consider those issues which are *timely brought to the attention of the trial court*." (emphasis added)). As this issue of the constitutionality of § 36-1-113(g)(6) was not properly raised in the trial court, it has effectively been waived for full consideration on appeal.

> It has long been the general rule that questions not raised in the trial court will not be entertained on appeal and this rule applies to an attempt to make a constitutional attack upon the validity of a statute for the first time on appeal unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion.

*Lawrence v. Stanford*, 655 S.W.2d [927,] 929 [(Tenn. 1983)].

*Id*. at 32-33. Accordingly, the sole constitutional question that the Supreme Court considered on appeal was whether the statute was blatantly unconstitutional on its face. *Id*. at 33.[1]

As the Supreme Court explained in *In re Adoption of E.N.R.*, it was "reluctant to creatively construe the present record as showing a properly raised and argued challenge to the constitutionality of a statute when even the implication is unclear." *See id*. at 30 (footnote omitted). The Court stated: "Our reluctance is especially justified given the absence of a ruling by the trial court on the constitutional challenge." *Id*. at 31. The High Court further clarified that it was "a court of appeals and errors . . . limited in authority to the adjudication of issues that are *presented and decided* in the trial courts, and a record thereof preserved as prescribed in the statutes and Rules of this Court." *Id*. at 31-32 (citing *Dorrier v. Dark*, 537 S.W.2d 888, 890 (Tenn. 1976)) (emphasis added).

Similarly, here, Father's mere mention of a constitutional violation in early motions to dismiss filed with the trial court was insufficient to properly raise a specific constitutional challenge to Tennessee Code Annotated § 36-1-113(g)(8) based on equal protection and due process. As a result, the trial court was never presented the opportunity to adjudicate the issue. Like the respondent parent in *In re Adoption of E.N.R.*, Father cannot "rely upon the importance of this issue as grounds for appellate review . . . given the short shrift it received at trial where it could have, and should have, been fully

---

[1] The Supreme Court also addressed the respondent parent's failure to notify the Attorney General of the challenge to the termination statute's constitutionality in accordance with Tennessee Code Annotated § 29-14-107 and Tennessee Rule of Civil Procedure 24.04. *See In re Adoption of E.N.R.*, 42 S.W.3d at 33. However, DCS was not a party in that case and, therefore, the Attorney General was not involved. *Id*. Here, DCS is a party and is represented by the Attorney General; accordingly, the Attorney General has been involved in the proceeding since its inception and has been served with all relevant pleadings.

adjudicated." *See In re Adoption of E.N.R.*, 42 S.W.3d at 32. We therefore determine that Father has waived any issue regarding the constitutionality of Tennessee Code Annotated § 36-1-113(g)(8) except the question of whether the statute is blatantly unconstitutional on its face. *Id*. at 33. Regarding that issue, we further determine that § 36-1-113(g)(8), which allows for termination of a parent's rights when clear and convincing evidence demonstrates that his or her "mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future" and that "termination . . . is in the best interest of the child," is not "so obviously unconstitutional on its face" as to obviate the necessity for any discussion. *See In re Adoption of E.N.R.*, 42 S.W.3d at 32; *see, e.g.*, *In re C.A.F.*, 114 S.W.3d 524, 531 (Tenn. Ct. App. 2003). Having so determined, we will proceed to address the remaining issues presented by the parents.

V. Grounds for Termination

Tennessee Code Annotated § 36-1-113 (West July 1, 2021, to current) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court concluded that the evidence clearly and convincingly supported two statutory grounds to terminate Father's and Mother's parental rights: (1) mental incompetence to adequately provide for the further care and supervision of the Children and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. We will address each statutory ground in turn.

- 9 -

A. Mental Incompetence to Adequately Provide for the
Further Care and Supervision of the Children

As fully quoted above, this statutory ground for termination requires a demonstration by clear and convincing evidence that:

> (i)      The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
>
> (ii)     That termination of parental or guardian rights is in the best interest of the child.

Tenn. Code Ann. § 36-1-113(g)(8)(B). In addition, the statute specifically states that no willfulness "in the failure of the parent . . . to establish [his or her] ability to care for the child" need be shown. Tenn. Code Ann. § 36-1-113(g)(8)(C).

The General Assembly's exclusion of willfulness from this statutory ground "serves to protect children from harm caused by a parent who is incapable of safely caring for them." *See In re D.A.P.*, No. E2007-02567-COA-R3-PT, 2008 WL 2687569, at *5 (Tenn. Ct. App. July 9, 2008). If willfulness were required in order to terminate parental rights for mental incompetence, "an obvious result . . . [would be] to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home." *See State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

This Court has rejected the argument that the ground of mental incompetence is reserved only for parents who have "a condition for which 'no amount of intervention can assist.'" *See In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008). This Court has instead affirmed the termination of parental rights when parents have suffered from unalleviated mental disorders such as bipolar disorder, adjustment disorder with anxiety and depressed mood, dependent personality disorder, and schizophrenic disorder. *See, e.g.*, *Smith*, 785 S.W.2d at 337-39 (affirming the termination of parental rights of a parent diagnosed with schizophrenic disorder on the basis of mental incompetence although the acts of the mentally disabled parent were not willful); *In re S.M.R.*, 2008 WL 4949236, at *6 (affirming termination of parental rights on the statutory ground of mental incompetence when the parent was diagnosed with bipolar disorder and personality disorder, not otherwise specified); *Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at *10 (Tenn. Ct.

- 10 -

App. Jan. 17, 2007) (affirming termination of parental rights on the statutory ground of mental incompetence predicated on a diagnosis of adjustment disorder with anxiety and depressed mood as well as dependent personality disorder). The parent's mental condition, however, must impair the parent to an extent that he or she cannot adequately provide for the care and supervision of the child. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

In its final judgment, the trial court found that DCS had proven this ground by clear and convincing evidence based on the witnesses' testimony regarding the parents' difficulties in exhibiting appropriate parenting skills and the evaluations performed by the expert witness, Mr. Beyer. The court noted the Children's special needs and found that the parents had been unable to provide proper care despite the services and instruction provided. The court also determined that although there had been some progress by the parents, deficiencies in care still existed and were unlikely to be remedied in the future. Following our thorough review of the proof presented, we conclude that the evidence preponderates in favor of the trial court's findings and determination regarding this statutory ground.

Mr. Beyer, a counselor and psychologist trained in performing parenting assessments, was the first witness to testify during trial. He related that he had evaluated Mother and Father in early 2019 at the behest of DCS. Mr. Beyer described Mother's appearance on that day as "dirty," stating that her clothing was soiled and bore a strong odor of cigarette smoke and that her hands were covered in dirt. Mr. Beyer also recounted that Mother appeared to be struggling to breathe, was coughing and wheezing, and that he had observed Mother and Father exit the smoke-filled car driven by Grandfather. Although Mr. Beyer believed that Mother might need medical attention, he reported that Father seemed unconcerned with Mother's state, claiming that she often struggled with her breathing. Despite this, the parents had left Mother's rescue inhaler at home. Father also exhibited no concern over Mother's appearance, explaining that she "liked to play in the dirt."

Following Mr. Beyer's evaluations, during which he read questions to Mother and Father and recorded their answers, Mr. Beyer concluded that both parents suffered from intellectual disabilities. Father scored low on tests designed to measure his verbal comprehension, perceptual reasoning, and memory. Father also self-reported to Mr. Beyer that he possessed the "mind of a six-year-old child." Father acknowledged taking medicines for depression, anxiety, and insomnia. Father also acknowledged that there existed cleanliness issues in the home, such as the presence of cockroaches. Based on his evaluation, Mr. Beyer reported that he would be concerned about Father's ability to take care of children, especially children with special needs. In his report, entered as an exhibit at trial, Mr. Beyer explained that Father's "intellectual functioning is unlikely to improve over time, even with instruction. [Father] would likely struggle to retain any information taught regarding parenting skills." In addition, Mr. Beyer opined that Father "would not likely be capable of responding to novel situations or crisis events" and that it would "be

- 11 -

inappropriate and irresponsible to leave [Father] alone and unsupervised with sole responsibility to provide for the children's care."

With reference to Mother, Mr. Beyer stated that she reported suffering from cerebral palsy and struggled to answer most questions asked. Mother scored "very low" on the verbal comprehension test, and Mr. Beyer was unable to administer other tests due to Mother's inability to answer questions. Mr. Beyer opined that Mother would be extremely dependent on Father such that Father would be responsible for her care as well as that of the Children. Accordingly, Mr. Beyer stated that Father's lack of concern with Mother's breathing distress and lack of basic hygiene was a "huge red flag."

Mr. Beyer further opined that Mother would be unable, due to her intellectual disability, to care for a child and stated that she could not be attentive to daily needs, much less an emergent situation. In his report, Mr. Beyer explained that Mother required assistance on a daily basis for her needs because she was incapable of meeting them on her own. Mr. Beyer opined that it was "not probable that [Mother] would benefit from parenting classes or other interventions designed to prepare her to care for her children. Her intellectual functioning is unlikely to change over time." He further noted that Mother "does not ever need to have primary care for the children." Mr. Beyer acknowledged, however, that he had not observed the parents interacting with the Children.

The trial court also considered testimony from Brad Garland, a sergeant with the City of Dickson Police Department, who reported that he had responded to a 911 call at the home shared by the parents and Grandparents on May 16, 2019. Sergeant Garland testified that when he arrived at the home, Father told him that Mother had become upset while on a phone call and had then put her hands around Dorothy's neck and had begun to "strangle" her.[2] Dorothy was two years old at the time. Father related to Sergeant Garland that he had to tackle Mother to get her to stop. Sergeant Garland stated that he spoke to Mother and that she did not seem to understand the seriousness of her actions; he further explained that Father made excuses for Mother's behavior.

Jennifer K. ("Foster Mother") testified that the Children had resided with her and her husband since May 2019. Foster Mother stated that when the Children came to reside in their home, the Children had to be bathed and fed. In addition, Dorothy had to be treated for lice. She also reported that Bella was nine months old at the time but was more like a three- to five-month-old child due to her delays. Dorothy was able to communicate a few words but not many.

Foster Mother, who was a teacher for many years but who chose to stop working and stay home with the Children due to their many appointments and significant needs, testified that both girls had been diagnosed with a genetic chromosome deletion condition

_____

[2] This event triggered the Children's removal from the home.

known as "17q12 deletion syndrome." By reason of this, they each suffered from kidney problems and were required to consume a large amount of water each day and use the bathroom frequently. Foster Mother related that the Children's condition also caused delays in language skills, fine motor skills, gross motor skills, and could lead to diabetes and mental illness later in life.

Foster Mother further recounted that each of the Children initially had required a significant amount of therapy of different types, resulting in several hours of appointments per week. Dorothy had made notable progress by the time of trial and no longer required therapy; rather, she attended yearly appointments to monitor her kidneys and continued to wear glasses and orthotic devices for other conditions. Bella still required numerous regular therapy sessions, including vision therapy, physical therapy, and feeding therapy. Bella also suffered from low muscle tone, resulting in the necessary use of her orthotic suit during waking hours. In addition, she was required to wear braces on her feet and glasses to improve her eye alignment. Because she was largely non-verbal, Bella also used a "talker" device, like an iPad, to communicate her needs and food preferences. Foster Mother reported that because of Bella's feeding challenges, she was on a "minced/mashed" diet and struggled to eat solid food.

Foster Mother demonstrated that she had sent pictures of the Children to Father and Mother and had helped the Children create a card for Mother on Mother's Day. She stated that she often communicated with the parents via email and transmitted copies of the Children's schedules and appointments to the parents. She indicated that although the parents were welcome to attend therapy sessions, they had rarely done so, attending only three appointments during the year of trial. Foster Mother reported that she had initially participated in visits with the parents but had stopped when the parents requested it. She added that she had to sometimes assist during visits because Bella would not eat for Father and Mother. Foster Mother related that she and her husband were bonded with the Children and wanted to adopt them. She further reported that the Children called them "mommy and daddy" and did not see Father and Mother as caregivers despite having a "connection" with them. Foster Mother explained that she maintained a good relationship with Mother and Father and would continue to provide information to them concerning the Children and maintain the Children's connection with the parents even if she adopted the Children. Foster Mother testified that the Children did not inquire about Mother and Father outside of their visits.

Kathryn Powers, an employee of Developmental Services of Dickson County ("DSDC"), testified that she had worked with the family beginning in 2019, providing support services. Ms. Powers explained that DSDC was a non-profit agency that offered services to individuals with intellectual disabilities. She also stated that the agency had at first provided services to the parents on a voluntary basis. DSDC subsequently entered into a contract with DCS to continue offering services to the parents, specifically

- 13 -

concerning communication and parenting skills. DSDC provided services to the parents off and on until 2023.

When working with the parents, Ms. Powers explained that DSDC employees modeled proper parenting skills for them, such as preparing food and helping Bella in and out of her orthotic suit. Ms. Powers articulated that these services were not conducted in the parents' home; rather, they were performed in a room at the DSDC office that mimicked a home environment with a kitchen and living room area. Ms. Powers noted that although Father did learn to put on Bella's suit and sometimes helped her eat, he was unable to demonstrate that he could successfully perform these tasks on a consistent basis. Ms. Powers stated that Mother was also unable to perform these tasks, even with the aid of Grandparents. Ms. Powers recognized that Grandfather was greatly involved in helping with the Children and exhibited no known intellectual disabilities although he did suffer from some physical health problems. Grandmother was not as involved in the Children's care and appeared to Ms. Powers to be "not very high functioning."

Ms. Powers opined that DCS had provided appropriate services and support for the parents, even though DCS and DSDC had experienced some differences regarding their respective "approaches" to the situation. Furthermore, Ms. Powers observed that although the parents loved the Children, they were simply unable to consistently demonstrate proper parenting skills. Although Ms. Powers indicated that she would have liked to work with the parents more frequently and in their own home, she acknowledged that such services were offered to the parents at some point and that the parents had been unwilling to participate.

Donald Redden, the Executive Director of DSDC, confirmed that DSDC had worked with the parents intermittently for about four years by the time of trial, at first on a voluntary basis and then subsequently under contract with DCS. Mr. Redden reported that the parents would need "quite a bit of support" to parent the Children, explaining that this supervision and support would need to be "24/7." Accordingly, he believed that the parents could not effectively parent the Children.

Dr. William Kenner, a psychiatrist, testified that he was asked by Adult Protective Services in 2022 to perform an evaluation of Mother to determine the potential necessity of a conservatorship. Dr. Kenner reported that Mother had refused to participate in testing. He also recalled that her interviews demonstrated that she needed support in all aspects of daily life because she was unable to communicate effectively and could not handle her finances or make decisions regarding her self-care. Dr. Kenner opined that Mother possessed a very limited capacity for learning how to function independently or care for the Children. He concluded that Mother needed a conservator and careful supervision, diagnosing Mother with severe intellectual developmental disorder.

Dr. Kenner explained that Mother was placed in a group home in 2022 after Adult Protective Services found that Mother was often dirty and left lying in bed "playing on her cell phone" in the family home. Mother, who suffered from Type 2 Diabetes, was not receiving proper medical care or medication. According to Dr. Kenner, the family seemed unable to manage Mother's behavior or ensure that she complied with medical treatment. Dr. Kenner also recounted that when he interviewed Mother in January 2022, she was lethargic, appeared "sickly," and "smelled like a diabetic in ketosis." When he next interviewed Mother in August 2022, after she had been living in the group home and receiving proper medical care, Mother appeared clean, energetic, healthy, and had a "brighter affect." However, Dr. Kenner opined that Mother presented significant cognitive defects that could not be improved, stating that there was "no way to help her with those."

Dr. Kenner further opined that Mother was impulsive and exhibited a lack of empathy that rendered her dangerous to the Children. Dr. Kenner related an incident detailed in Mother's records from Adult Protective Services wherein Mother became upset with Dorothy during a visit and yelled, "Dorothy, I hate you!" According to Dr. Kenner, Mother had also developed anger toward another resident who lived with her in the group home. In his opinion, Mother would need constant supervision when present with the Children, and he included that the other adults in the family home were ineffective in dealing with Mother.

Amelia Duckett, the DCS caseworker assigned to the family beginning in 2021, testified regarding the parents' lack of progress with parenting skills despite significant services provided by DCS. Ms. Duckett explained that services had been provided by Camelot, a provider of therapeutic visitation services, to demonstrate parenting skills, but she stated that these services were terminated at the parents' request. DCS then provided services via its contract with DSDC, but after considerable instruction, the parents were still unable to consistently demonstrate that they could feed the Children. Ms. Duckett added that she had also observed that Grandparents' ability to assist had declined through the years.

Ms. Duckett reported that DCS had attempted to customize the services it provided to meet the specific needs of Mother and Father due to their respective cognitive deficiencies. Despite this, the parents had not made sufficient improvement to enable them to progress to unsupervised visits. Ms. Duckett articulated that she would be concerned about the parents' ability to properly respond to an emergency situation involving the Children. She specifically recalled an incident when Grandmother fell and hit her head while exiting the car for a visit, and the family allowed her to remain in the car and did not seek medical attention even though she was vomiting. Ms. Duckett stated that the family only sought treatment after significant encouragement from DCS employees. In addition, Ms. Duckett reported that the parents had attended only three out of 130 medical appointments for the Children in the last year, which was concerning because if the parents

- 15 -

had custody of the Children, they would need to ensure that the Children attended all of the scheduled appointments.

Jacquelyn Griffin, the Children's CASA advocate, testified that there were environmental concerns present in the parents' home in 2020 when she first visited. Ms. Griffin had provided help via her church to address and repair some of the issues. She stated that cleanliness concerns persisted when she had last visited the home in 2023, but that the family was "trying to improve." Regarding services provided by DCS, Ms. Griffin propounded that DCS had afforded the parents "full and ample opportunity" for improvement with the services that had been provided. However, she had seen no improvement in the parents' parenting skills. She opined that any apparent lack of help was due to the family's refusal of it.

Ms. Griffin further reported that the family often lacked collaboration, which hindered their progress in exhibiting proper parenting skills. She also related that the Children did not view the parents in a parental role although they enjoyed the "playtime" during visits. According to Ms. Griffin, the parents had never consistently used the Children's therapeutic devices or exhibited the skill of feeding them properly.

Grandfather and Father both emphasized their love for the Children and their bond with them. Grandfather explained that the entire family parented the Children as a unit. He urged that if the Children were returned to them, he would do a better job protecting the Children. Grandfather acknowledged that he was at home when the incident of Mother's strangling Dorothy occurred in May 2019, but he indicated that he was in a different room at the time.

Grandfather reported that he had smoked cigarettes for fifty-three years but had stopped smoking two weeks prior to trial. He acknowledged smoking around Mother for years despite her asthma, admitting that this was detrimental to her health. When questioned about whether the family home would be ready for the Children to return to it on the day of trial, Grandfather responded that it was not because it needed to be cleaned and the family was "backed up on laundry." Grandfather conceded that Mother had been removed to a group home for approximately one year because the family was not taking proper care of Mother and because she was not receiving her diabetes medication.

Father testified that each member of the family received some type of monthly benefit from Social Security, with which they paid expenses. He stated that he had attempted to work for DoorDash but made no money doing so. According to Father, he regularly took care of Mother and dispensed her medications. However, Father admitted that Mother was removed from the home by Adult Protective Services because her blood sugar level was elevated. Father also admitted that he smoked around Mother despite her asthma.

Father explained that he had practiced with Bella's suit and could get her into it. Regarding meals, however, despite his urging, Bella would eat nothing other than peanut butter and jelly mixed with banana. Father acknowledged that he had difficulty placing Bella into a car seat and admitted that he and Mother had not attended various training sessions offered regarding use of the car seat as well as cardiopulmonary resuscitation ("CPR") and first aid. Father further admitted that Mother and he had only attended three of Bella's therapy sessions this year. When asked if he had a disability, Father indicated that he did not. However, he noted that he had an individualized education program ("IEP") during school.

Upon review, we conclude that the evidence during trial clearly and convincingly demonstrated that both Father and Mother were incompetent to adequately provide for the further care and supervision of the Children because of their respective mental impairments. The evaluations performed by Mr. Beyer and Dr. Kenner proved that both Father and Mother suffered from significant intellectual disabilities with Mother functioning at a lower cognitive level than that of Father. Both evaluators opined that the parents would be unlikely to achieve improvement sufficient to prepare them to safely parent the Children.

In addition, the testimonies of numerous other witnesses who assisted in providing services for the parents during the four years prior to trial demonstrated that it was unlikely that either parent would be able to assume or resume the care of and responsibility for the Children in the near future. Despite significant services provided by DCS, neither parent had been able to properly feed the Children or effectively utilize the Children's therapeutic devices. Accordingly, we agree with the trial court's findings and conclude that the evidence does not preponderate against the court's determination that DCS had proven this statutory ground by clear and convincing evidence. We therefore affirm the trial court's reliance in its termination order on the ground of the parents' mental incompetence to adequately provide for the further care and supervision of the Children.[3]

### B. Failure to Manifest an Ability and Willingness to Assume Legal and Physical Custody of or Financial Responsibility for the Children

The trial court also found clear and convincing evidence of the statutory ground of failure to manifest an ability and willingness to assume custody of or financial responsibility for the Children. In regard to this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) provides:

---

[3] We recognize that this statutory ground also requires a finding that termination of parental rights is in the Children's best interest. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(ii). The trial court's best interest findings will be analyzed in a subsequent section of this Opinion.

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To establish this ground, DCS was required to show by clear and convincing evidence that (1) Father and Mother failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Children and (2) returning the Children to Father's or Mother's custody would pose a risk of substantial harm to the Children's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

As to the first prong, our Supreme Court has instructed:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

In its final judgment, the trial court rendered specific findings of fact regarding this statutory ground. The court found that although the parents clearly manifested a

willingness to care for the Children, they did not have the ability to do so. The court also found that placing the Children in the custody of the parents would pose a risk of substantial harm to the Children, particularly due to the Children's special needs and the parents' limitations. The court noted that although the Children had been in DCS custody for nearly four years, Mother and Father had been unable to progress to the level of enjoying unsupervised visitation with the Children. Upon review, we agree with the trial court.

DCS presented clear and convincing evidence establishing that Father and Mother had failed to manifest an ability to assume custody of the Children. We reiterate that despite significant services provided by DCS for a period of approximately four years, neither parent demonstrated appropriate parenting skills for the Children by the time of trial. During supervised visits, the parents were unable to properly feed the Children and could not consistently remove and reapply Bella's required suit. Service providers observed that the parents either refused or were unable to ensure that Bella wore her glasses or used her "talker" as necessary. They noted that the parents also were unable to consistently fasten Bella's car seat. Several witnesses at trial consistently testified that the parents had been unable to demonstrate proper parenting skills despite the significant coaching they had received.

DCS also presented clear and convincing evidence establishing that returning the Children to Father's or Mother's custody would pose a risk of substantial harm to the Children's welfare. Due to the parents' inability to exhibit proper daily parenting skills, the Children would likely be exposed to some degree of neglect in Mother's and Father's care. In addition, some service providers expressed fear of what would happen if an emergency situation arose. Regarding the risk of harm as it relates to Mother, we emphasize her past behavior of "lashing out" at Dorothy and Dr. Kenner's testimony stating that Mother's lack of empathy posed a danger to the Children. With reference to Father, we find it significant that Mother's health concerns were seemingly ignored and allowed to worsen to the point that Mother was removed from the home by Adult Protective Services during a time when Father reported that he was caring for Mother and dispensing her medication.

Although Father exhibited some progress with certain parenting skills as a result of the services provided, he never demonstrated consistency in these skills so as to allow him to enjoy unsupervised visitation, much less to resume custody. Significantly, none of the non-family witnesses who testified expressed a belief that Father or Mother would be able to safely and effectively parent the Children without constant supervision. In addition, as the trial court noted, the Children were thriving in their pre-adoptive home and had bonded well with their foster parents such that removing them from that home, where they had resided for the better part of their lives, would be detrimental. For these reasons, we conclude that the evidence does not preponderate against the trial court's determination that DCS had proven this statutory ground by clear and convincing evidence. We therefore affirm the trial court's reliance in its termination order on the ground of failure to manifest

an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.

## VI.  Best Interest of the Children

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))).  Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest.  This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case.").  Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to current) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides:  "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."  Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis.  In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).  Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence."  In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861).  "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]."  Id.  When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective."  In re Audrey S., 182 S.W.3d at 878.  Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors.  Id.  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."  Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court weighed several of the best interest factors in favor of terminating Mother's and Father's parental rights. Upon our thorough review of the evidence presented, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence in significant part.

With reference to factor (A), the "effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority," and factor (B), the "effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition," we agree with the trial court that both of these factors weigh in favor of termination. Foster Mother testified that the Children had bonded with her and her husband and were doing well in their care. The Children had resided with their foster parents for four years by the time of trial, which was the majority of the Children's lives. The foster parents demonstrated that they could properly parent the Children and provide for all of their needs, including Bella's significant medical needs. Meanwhile, Father and Mother were unable to establish appropriate parenting skills or meet the Children's daily needs despite considerable instruction and services during the years when the Children had been in foster care.

Respecting factor (C), whether Mother and Father had demonstrated continuity and stability in meeting the Children's basic needs, including safety and medical care, the

- 23 -

evidence showed that the Children were subjected to violence, neglect, and environmental hazards while in the parents' custody before being placed in foster care. During supervised visits, Mother and Father were unable to demonstrate that they could consistently meet the Children's needs relative to feeding, car seat safety, and use of necessary therapeutic tools. Accordingly, this factor also weighs in favor of termination concerning both parents.

Factor (D), which focuses upon whether the "parent and child have a secure and healthy parental attachment," and factor (E), which addresses whether the parents have maintained regular visitation with the Children, both weigh against termination. The proof established that the Children did maintain a bond or "connection" with the parents although concerns were raised regarding whether the Children perceived Mother and Father in a parental role. The proof also demonstrated that the parents regularly participated in visitation with the Children.

Factors (F) and (G) relate to the Children's previous experiences in the parents' home and any trauma resulting from those experiences. Due to the young ages of the Children when they came into custody, there was no proof regarding whether the Children were fearful of living in the parents' home or whether the home would "trigger or exacerbate the child's experience of trauma." We therefore agree with the trial court that factors (F) and (G) are inapplicable and thus weigh neither for nor against termination.

Concerning factor (H), whether the Children have "created a healthy parental attachment with another person or persons in the absence of the parent[s]," the evidence was clear that the Children were bonded with their foster parents and were thriving in their care. Ergo, this factor weighs in favor of termination. Factor (I), however, which prompts examination of whether the Children have significant relationships with people other than the parents, would weigh against termination due to the close relationship the Children enjoy with Grandparents.

With regard to factor (J), which questions whether "the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent" and includes consideration of whether there is criminal activity, use of alcohol, or use of drugs in the home, the trial court found this factor inapplicable due to the lack of proof concerning criminal activity or controlled substances. We disagree. Even without proof of criminal activity or the use of controlled substances, we determine that the parents have not demonstrated a lasting adjustment of their circumstances that would render it safe for the Children to be in their home. This factor weighs in favor of termination.

The trial court weighed factor (K), concerning whether the parents had taken advantage of all available services, in favor of termination. The evidence preponderates in favor of the court's findings. The testimony of several witnesses supported a finding that the parents had declined many services that were offered throughout the history of the case.

- 24 -

We similarly agree with the court's finding that factor (L) weighed in favor of termination because the proof demonstrated that DCS offered services to the parents that were more than reasonable.

Relative to factor (M), whether the parents had shown a sense of urgency in addressing the circumstances leading to the Children's removal, the trial court found the factor to be inapplicable. We disagree that the factor is inapplicable, but we do find the proof to be conflicting. Mother and Father participated in regular visitation with the Children and also participated in some services while refusing many others. The parents failed to attend almost all of the Children' medical appointments but did maintain regular communication with the service providers and Foster Mother. Accordingly, we conclude that this factor weighs against termination.

The trial court similarly found factor (N) to be inapplicable. We determine that this factor, which analyzes whether "the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward" the Children, is applicable to the extent that the Children were shown to have been subjected to a certain degree of neglect before their removal from the parents' home, in addition to the instance of violent behavior by Mother that resulted in placement of the Children in foster care. The trial court read a requirement of intent into this factor, but we determine that the plain language incorporated does not support the conclusion that intent to harm must be shown. We therefore find that this factor weighs in favor of termination.

Considering whether Mother and Father have ever provided safe and stable care for the Children in accordance with factor (O), we agree with the trial court that this factor must weigh against termination because the parents did successfully parent the Children, at least for a short period of time, before the Children's custody was transferred to Grandparents. However, with respect to factor (P), the trial court determined that it weighed in favor of termination because Father and Mother had not demonstrated an understanding of the basic and specific needs required for the Children to thrive. We agree that this factor weighs in favor of termination based on the evidence presented regarding the parents' inability to understand and accommodate the Children's needs. Similarly, factor (Q), regarding whether the parents have shown "the ability and commitment to creating and maintaining a home that meets the [Children's] basic and specific needs and in which the [Children] can thrive," and factor (R), concerning whether the physical environment of the parents' home is healthy and safe for the Children, must weigh in favor of termination for the same reasons.

Concerning factor (S), which questions whether the parents have consistently provided more than token financial support for the Children, we note that DCS provided no evidence whatsoever concerning this factor. We therefore determine that because nothing in the record supports a finding in favor of termination relative to this factor, it

should weigh against termination. *See In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) (determining that a factor in the best interest analysis that is "not proven to weigh in favor of termination . . . weighs against termination."). Finally, factor (T) involves whether the parents' mental or emotional fitness would be detrimental to the Children or prevent the parents from consistently and effectively providing safe and stable care and supervision. Based on the totality of the evidence presented, we agree with the trial court that factor (T) weighs in favor of termination of Mother's and Father's parental rights and should be weighed as significant to the overall analysis of best interest.

Considering all of the applicable factors, we conclude that the evidence weighs in favor of terminating Mother's and Father's parental rights to the Children. In the four years following the Children's removal, Mother and Father had shown little progress in demonstrating appropriate parenting skills so as to provide a suitable and safe home for the Children. Due to the parents' respective intellectual disabilities, which were shown to likely be insurmountable obstacles to the parent's ability to adequately care for the Children, we conclude that it is in the Children's best interest to terminate Mother's and Father's parental rights. We therefore affirm the trial court's finding by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Children's best interest.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in its entirety. We remand this matter to the trial court for collection of costs assessed below. Costs on appeal are assessed equally to the appellants, Abigail A. and Austin A.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE